DECISION
This is an appeal by defendant-appellant, Dale M. Ratcliff, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which defendant was convicted of attempted murder and felonious assault.
On April 27, 2001, defendant was indicted on one count of attempted murder, in violation of R.C. 2923.02 and 2903.02, and two counts of felonious assault, in violation of R.C. 2903.11. The indictment arose out of an incident occurring on April 1, 2001, in which the victim, Edward Kline, was stabbed multiple times.
The matter came for trial before a jury beginning October 22, 2001. The first witness for the state was Columbus Police Officer Ryan Chrysler. In the early morning hours of April 1, 2001, Officer Chrysler was dispatched to 887 Moon Road. The officer entered the house and observed a male lying on the floor. Two other individuals, a male and a female, were also inside the residence. They informed the officer that the assailant was "gone." (Tr. 95.) The woman provided the officer with the name Dale M. Ratcliff. Officer Chrysler noticed liquor bottles in the kitchen area and empty beer cans in the living room area. No weapon was recovered at the scene.
Edward Kline, the stabbing victim, testified that the incident occurred at the residence of Terri Petrie. Another individual, Gerald Hughes, also lived at that residence at the time. The day before the incident, at approximately 4:30 p.m., Kline stopped at Petrie's residence. Petrie and Hughes were drinking beer, and they asked Kline to join them. Kline then drove Hughes to pick up a paycheck, and they stopped briefly at a bar, returning to Petrie's residence at approximately 6:30 p.m.
When they arrived back at the house, defendant was there with Petrie. Kline later went to a liquor store and bought a bottle of "Jim Beam" and a bottle of "Skyy Vodka." All the individuals sat around drinking, talking and joking. Occasionally, Kline would observe defendant "take a pill bottle out" and "do a couple pills and drink it down with a shot." (Tr. 103.) Earlier in the evening defendant and Kline exchanged words, and Kline "was trying to avoid an incident, and [defendant] kept trying to egg it on." (Tr. 103.) Defendant "kept arguing," and finally Kline stood up and told defendant to shut his mouth "or I was going to hit him." (Tr. 104.) At that point, Hughes pushed Kline down on the couch and would not let him get back up.
At approximately 10:00 p.m., Kline, Hughes and Petrie left the house and went to a bar. Kline and Hughes left the bar at approximately 3:00 a.m., but Petrie had left the bar earlier with someone else. When Kline and Hughes returned to Petrie's residence, Petrie was sitting in the living room and defendant was in the kitchen "griping at Ms. Petrie about the fact that she had left the bar with some other guy and brought him in the house." (Tr. 105.) According to Kline, Petrie and defendant were once engaged.
Hughes and Kline entered the house and Petrie "was thankful we were there, figuring [defendant] might calm down." (Tr. 106.) Petrie went into the bathroom. Kline then informed Petrie he was getting ready to leave. Kline went outside and sat in his car for approximately five to ten minutes. Kline and Petrie had discussed leaving together. Kline then went back inside the house and said he was ready to leave. Kline indicated that he was tired of the arguing. At that time, defendant came from the kitchen and said, "I'm tired of you, too." (Tr. 107.) Kline then gave the following testimony regarding the incident:
 He come running up at me like this. The only thing I did was put my arm up, and he caught me up here with a stab wound. It didn't feel right. After the third or fourth time, I realized he was stabbing me.
I hollered out, "Get him the ['F'] off of me."
 I don't know what happened from then on. I know I was trying to get away from him. I was scared. The next thing I know, I'm on the floor. That's all I can remember from then on. [Tr. 107.]
Prior to the incident, Kline estimated that he had consumed a "12-pack" of beer. (Tr. 107.) Kline could not remember if defendant said anything during the incident. Kline testified that he was "too scared about * * * getting stabbed. I was just trying to get away at the time, trying to get him off of me, get away from the incident, get as far away from him as I could." (Tr. 109.)
Kline was transported to Riverside Methodist Hospital, and he remained in the hospital for one and one-half weeks. Kline stated that he was stabbed nine times, and that both of his lungs were punctured and collapsed as a result of the stabbing. He also suffered injury to his spleen and pancreas.
Kline stated that he did not have a weapon on the night of the incident. He also stated that he did not start the fight that evening, and that he had no idea he was about to be attacked.
Columbus Police Detective Patrick Dorn was involved in the investigation of the case. At trial, Detective Dorn identified a knife that had been found near the crime scene. The knife was between seven or eight inches in length, and weighed approximately 12 ounces.
Detective Dorn testified that a warrant was issued for defendant's arrest, but defendant was not located until two days later following a tip received by police officers indicating that he was planning to leave Columbus and travel to Kansas. Defendant was eventually apprehended in Kansas by authorities from that state.
The first witness called by the defense was Terri Petrie. Petrie has known Edward Kline for approximately five to seven years. Petrie also was acquainted with defendant, and she and defendant once dated and lived together. Kline and defendant did not have a good relationship. Petrie related an incident before Thanksgiving when Kline and defendant had an argument. Kline told Petrie that he wanted to fight defendant, but Petrie told Kline, "not in my house." (Tr. 182.) According to Petrie, Kline stated, "I was going to kill him, I was going to kill him." (Tr. 182.)
At the time of the incident on April 1, 2001, Petrie resided with her two children and her cousin, Gerald Hughes. On the day before the incident, Kline had come over to Petrie's residence in the afternoon. Later, they went to a bar. At approximately 1:00 a.m., a friend of the owner of the bar drove Petrie home. Petrie's two children and defendant were at the residence. Petrie did not remember arguing with defendant when she arrived at the house.
Petrie testified that she did not witness the stabbing incident. Petrie related, "I was walking around my daybed, and Eddie was coming from my kitchen, and I didn't see Jerry, I didn't see Dale." (Tr. 191.) Petrie heard Kline say, "[h]e stabbed me. He f'g stabbed me.['] And I said, [']Who?['] And he said, [']Dale.['] And the next thing I know, he fell to the floor." (Tr. 191.) Petrie did not see defendant after that time. On cross-examination, Petrie stated that she never observed Kline attempt to hit defendant.
Gerald Hughes has resided at Petrie's house at 887 Moon Road for approximately one year. On the date before the incident, Kline came over to the house at approximately 4:00 p.m. Kline gave Hughes a ride so that Hughes could pick up a paycheck. After getting the check, Kline and Hughes stopped at a bar to drink beer. They returned to the residence on Moon Road and drank more beer. More liquor was obtained later from a liquor store.
Hughes stated that during the evening "a couple conflicts" arose, and that Hughes had to physically restrain Kline "to get him to cool down." (Tr. 206.) Later, Kline, Petrie and Hughes left the house to go to a bar, while defendant remained at the house. Petrie subsequently left the bar, and Kline and Hughes left at a later time.
After returning to the house, Hughes went to the living room and began eating some food they had picked up on the way home. Hughes could not recall where defendant was at that time. As Hughes was sitting on a couch, he heard Petrie yell, "Ed had been stabbed." (Tr. 210.) Hughes stated, "I got up. I think I got into conflict, probably with Dale, told him to leave the house, whatever, and returned back in with Ed, who was laying on the living room floor." (Tr. 210.) Hughes did not remember hearing any type of argument prior to the incident. On cross-examination, Hughes stated that he recalled telling police officers that Petrie and defendant would get into arguments, and that defendant was jealous of any contact Petrie might have with anyone of the opposite sex.
Defendant testified on his own behalf. Defendant acknowledged during direct testimony that he had a prior criminal record, including five felonies. Defendant stated that he injured his shoulder in November 2000, and that he had been taking pain medication since that time. Defendant stated that at the time of the incident Petrie was his fiancée. Defendant first met Kline in September of 2000.
Regarding the incident on April 1, 2001, defendant testified that Kline came over to the house the day before in the afternoon. According to defendant, Kline "threatened me." (Tr. 230.) At first, defendant "paid him no attention," but later Kline "came towards me to put his hands on me and physically hurt me. At that point, that's when Jerry had to intercept him and hold him down on the couch." (Tr. 230.) Kline eventually calmed down, but later "he became belligerent again and tried to attack me again physically." (Tr. 231.) Hughes again interceded and Kline calmed down.
Defendant stated that, during the evening, at approximately 6:00 p.m., he showed Kline two knives he had recently purchased at a gun show. Kline asked to use one of the knives to engrave his name on a cigarette lighter. Defendant did not remember Kline giving him the knife back.
Petrie, Kline and Hughes later went out to a bar and defendant remained at the house with Petrie's children. Defendant fell asleep, and Petrie arrived back at the house at 3:36 a.m. Petrie came home with another individual, and when defendant asked who this person was, Petrie responded, "[d]on't worry about it." (Tr. 236.) Defendant denied that he was aggressive or violent, and the individual who accompanied Petrie from the bar left the house.
Later, Kline and Hughes arrived at the house and came in the living room where defendant and Petrie were sitting. According to defendant, Kline "seemed to still be belligerent towards me." (Tr. 237.) Defendant decided to spend the night at the house of a co-worker because he "didn't want anymore trouble." (Tr. 237.) Petrie went into the bathroom and "Kline became belligerent." (Tr. 238.) Defendant observed Kline go toward the bathroom, and he heard the door shut. Defendant then went to the door and knocked on it, and told Petrie, "I'm leaving. I'm going to check the laundry to see if my work clothes are dry, and I'm going over to Gary's tonight." (Tr. 238.)
Defendant went to the basement to get his clothes and he heard "the bathroom door get yanked open." (Tr. 238.) Defendant heard Kline say, "[w]here's Dale at? Come outside. I'll show you." (Tr. 238.) According to defendant, Kline was talking about a fight at that time.
Defendant began walking up the basement steps with a duffle bag when Kline came back into the house. Defendant then gave the following testimony regarding the events:
 He came at me, and as soon as I seen him and he had that look on his face that I've seen whenever he's threatened me before, like he was going to beat me up, and he's coming through the living room and the kitchen area if you still have the photos, there's a little half wall and a small doorway space where if you're going out the front door, you have to pass.
 He took exactly the full width of that doorway up. He's coming towards me. He said, "Yeah, I'm gonna get you now, motherfucker." I seen the knife in his hand. It was a switch-blade-type knife. He went to open it.
 For some reason, he threw it on the floor. I don't know if that's because his hands were wet because he was in the bathroom and washing his hands. [Tr. 242.]
According to defendant, the knife landed on the floor by the kitchen oven and refrigerator. Defendant stated that he looked up and Kline "rushed me, kicked me between the legs. Immediately, I dropped down. He started stomping on my shoulder." (Tr. 244.) Defendant further testified as follows:
 When I went down when he kicked me between the legs and I fell down to the floor, then he started stomping on my shoulder. There's a stove. The oven is on this side. It's like an "L" shape. There's an open space and cabinets above.
 I was standing there, and I seen the knife fall down towards by the refrigerator, which would have been right there, and the oven was here, and I landed here (indicating).
 I had seen the knife. I tried to ball up. My right shoulder was on top. He started stomping on it. I seen the knife, grabbed it with my left hand and lunged at him to get him to back off. [Tr. 244-245.]
According to defendant, either Kline opened the knife or it opened when it landed on the floor. As defendant lunged at Kline, he stabbed Kline on his right side. Defendant further testified as follows:
 I remember stabbing him on his right side. I remember that we rolled around on the ground. We rolled, and the way he got to the floor was when we were scuffling in the living room right past Jerry, but he was in the blackout.
 I know when he has these. I've had a blackout before off of my medication, but I remember we was wrestling. At this time, Edward had the knife. I had tripped over the leg of the little coffee table that was there. We both went down onto the floor.
 The knife fell. I grabbed the knife again except at that time, it was in my right hand. I remember because he had his hands around my neck like this (indicating). He was trying to choke me to death. I was having a hard time breathing. I was starting to pass out.
 I remember stabbing him on this side here (indicating). We rolled around on the ground. The knife was in my hand, but my arm was pinned underneath him. He was still choking me like that, and I remember Jerry pulling us apart and pushing me out the front door. [Tr. 246.]
According to defendant, when defendant began assaulting him he was "scared to death because he was stomping on my shoulder." (Tr. 250.) Defendant testified, "I * * * stabbed him in my defense." (Tr. 259.)
The jury returned verdicts finding defendant guilty of attempted murder and felonious assault. The prosecution elected to have defendant sentenced on count one, attempted murder, and by judgment entry filed October 31, 2001, the trial court sentenced defendant to a ten-year term of incarceration.
On appeal, defendant sets forth the following single assignment of error for review:
 THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY NOT PROVIDING THE JURY WITH AN INSTRUCTION REGARDING AGGRAVATED ASSAULT.
Under his single assignment of error, defendant asserts that the trial court erred in failing to give a requested instruction on aggravated assault. Defendant maintains that there was less evidence to corroborate the victim's account than defendant's version, and that the evidence tends to support defendant's claim that the victim attacked him. Defendant contends that, had the instruction been given, the jury would have been more inclined to find him guilty of aggravated assault and less inclined to find him guilty of either attempted murder or felonious assault.
In general, "[t]he purpose behind instructions to a jury is to point to the issues in a case and to demonstrate how the jury should apply evidence in various aspects developed at trial." State v. Tantarelli (1995), Franklin App. No. 94APA11-1618. A trial court must give an instruction on an inferior-degree offense "when the evidence adduced at trial would reasonably support both an acquittal on the crime charged and a conviction on the * * * inferior-degree offense." State v. Monroe (2000), Franklin App. No. 99AP-1464.
The offenses of aggravated assault and felonious assault both involve knowingly causing physical harm to another by means of a deadly weapon. State v. Keeton (1998), Clark App. No. 98 CA 13. However, the offense of aggravated assault provides for a "lesser sentence where the defendant commits the assault `while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force.'" Id.
In State v. Shane (1992), 63 Ohio St.3d 630, 634, the Ohio Supreme Court held that:
 An inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components. * * * In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage. It is only at that point that the "* * * emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time * * *" must be considered. * * *
In the present case, while the evidence may have been sufficient to satisfy the objective component, there was insufficient evidence presented to satisfy the subjective component of whether defendant actually was under the influence of sudden passion or in a sudden fit of rage. Specifically, as noted by the state, the only evidence as to defendant's mental and emotional state was defendant's testimony that he was "scared." The Ohio Supreme Court has held that "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." State v. Mack (1998),82 Ohio St.3d 198, 201. Further, defendant's theory was that he acted in self-defense when he stabbed Kline.
Defendant contends that the facts of this case are similar to those in State v. Dixon (2001), Franklin App. No. 01AP-22, in which this court held that the trial court erred in determining that, as a matter of law, appellant was not entitled to an instruction on aggravated assault. In that case, the appellant was indicted for felonious assault following an altercation with his wife in which defendant cut her with a knife.
Upon review, we find the facts of Dixon to be distinguishable from the instant case. Specifically, in Dixon, the appellant testified that he became "enraged" after his wife took a telephone call from a male friend. Appellant and his wife then had an argument that escalated, and appellant subsequently became "extremely enraged" when his wife told him that she was having sexual relations with the friend. This court in Dixon found that the testimony revealed a series of incidents, all within a relatively short period of time, culminating in the wife's response with words "which seemed calculated to provoke an angry response." In contrast to the testimony of the appellant in Dixon, who testified that he became enraged during the altercation, in the instant case defendant did not indicate he was angry; rather, defendant stated that he was "scared," and that he lunged at the victim with a knife in "defense" because the victim was attempting to choke him.
We find the present case to be more analogous to the facts in Tantarelli, supra, in which the appellant testified that the victim started a fight by punching appellant in the face. The victim continued to punch the appellant, who attempted to retreat. At some point, when the victim was no longer hitting him, the appellant pulled out a gun, pointed it in the victim's direction and began shooting. Appellant testified that he was very scared and that he only wanted the victim to stop hitting him. In Tantarelli, this court held that appellant introduced sufficient evidence that, if believed, raised the question of self-defense; however, this court rejected appellant's contention that he was entitled to an instruction on voluntary manslaughter, holding in part:
 * * * Although it could be argued that the beating appellant was taking by the victim was serious provocation that would be reasonably sufficient to incite him into using deadly force, there is simply no evidence that appellant was under the influence of sudden passion or in a sudden fit of rage. Instead, appellant himself testified that he was dazed and confused and that he was scared. Appellant did not state that he was angry. Instead, appellant testified that his only intent was to stop the victim from hitting him anymore. The evidence presented by appellant simply does not fit into the definition of involuntary manslaughter and the trial court correctly decided not to give this instruction to the jury.
See, also, State v. Adcox (2000), Lorain App. No. 98CA007049 (trial court did not err in refusing to give instruction on aggravated assault where defendant contended that he acted in self-defense based on his assertions that he was afraid because victim was wielding a knife, and that he lunged at victim in attempt to subdue him rather than because defendant provoked him); State v. Maggard (1999), Montgomery App. No. 17198 (defendant did not present sufficient evidence that he shot victim due to anger or passion caused by victim's provocation; although one could find objective evidence of provocation where defendant testified he saw gun in victim's hands and victim had made threats, subjective component not present where defendant's testimony was simply that he was afraid and that he shot in self-defense).
In the present case, defendant's theory of the case was that he acted in self-defense and we note that the trial court gave the jury a self-defense instruction. This self-defense theory was consistent with defendant's testimony that he was scared and that he struck at the victim with the knife out of fear for his safety. However, the evidence was insufficient for the trier of fact to find that defendant was actually under the influence of sudden passion or in a sudden fit of rage and, therefore, the trial court did not err in refusing to give an aggravated assault instruction.
Based upon the foregoing, defendant's single assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
PETREE and LAZARUS, JJ., concur.